Good morning, Your Honor. Good morning. My name is Bernadette Willeke Connelly, and I'm the attorney for the petitioner Luz D'Avia Franco-Garces and her daughter Alexandra Vanegas-Franco. At the outset, I would like to state that the second daughter's case was severed, and she already received her green card based on her marriage. So we're only dealing with those two petitioners. The petitioners respectfully request that this Court find that they are statutorily eligible for asylum and to remand this case back to the Board of Immigration Appeals so that it can exercise its discretion. In the alternative, the petitioner requests that she be granted withholding of removal. There are two main issues in this case. The first one is there's a repeated credible death threat, which are specific and menacing, and that are coupled with in-person confrontation. That's right. Why don't I like to ask you right there on that, because I think you're going right to the thrust of it. If you're using the standard that's articulated in LIM, the INS, and RUANO, the Ashcroft, is it your position that your client was closely confronted? And how is your case more like RUANO than LIM? Well, it's our position that she was closely confronted in that she was threatened with a handgun. While nobody shot at her and it was done through a driving car, still a handgun was pointed at her. Well, yeah, it's not probably good news to be looking at the business end of a gun. But then her house was also shot at or? Yes, her house was also shot at once, but she wasn't in the house. But that doesn't matter because there's nothing in the record to indicate that she was not in the house. Also, in addition to that, not only she herself was threatened, but the organization to which she belonged and members of the organization that she belonged to, about 20 of them, were threatened. Four of them, excuse me, three of them were killed, and a fourth one was disappeared. So I think it's closer to RUANO. All right, thank you. And your position that the, well, Columbia is a very violent place. Yes. Your position linking this violence up, which there was no direct evidence that this was linked to her political opinion or her work in this organization. Your position is because there were all these other threats and murders that we're to say that that's compelling evidence that this is linked to her political opinion? That is correct, Your Honor. I think it's a reasonable inference. The organization she belonged to had about only 100 members. Out of those 20, that is 20 percent, were threatened. And then out of those, again, three people were killed. Yes, but the problem is it's not that it's a reason. Don't you have to show more than a reasonable inference? Yes. Don't you have to show that it's compelled? Yes. And I think it is compelled in this case because the petitioner received repeated death threats. And there is evidence in the record that that was, that those death threats were by the ELN. But threats by themselves are ordinarily not enough to constitute persecution under our case law. The question in my mind becomes how credible were the threats? What was the prospect of it actually turning into the possibility of an assault? Yes, Your Honor. The expert witness actually addressed that exact question in his testimony. And he said that the threats would escalate to a next level. He said, and I'm going to quote him, that the ELN targets unarmed civilians as part of what they perceive to be the legitimate political purpose. He said, and when they start to make threats, they will move to the next stage of acting on these threats because if they don't, they lose legitimacy in some way as a threatening organization, as a guerrilla organization. So they can't just threaten and not follow up. And that's on AR111. I'm sorry, 119. And then he asked a rhetorical question. He said, do they kill everybody they threaten? No. Do they terrorize? Yes. Do they torture? Yes. Do they force Colombians to leave their own home and their business and their cities and their kin? And he answered yes. And he specifically stated that in the Petitioner's case, there is works coming to action when you have a bullet shot into the house, when you have people pulled up in front of the house with a gun at night. He stated that again at AR119.  In other cases, you've got someone whose personal activities or who has a leadership position in an organization that's been targeted. But I haven't really seen anything that indicates why it is this person is going to be of such interest to the guerrillas. She's a member of the organization, but the organization has 100 members, and she doesn't seem to have a particular leadership position within it. No, Your Honor, but she volunteered her time. She participated in demonstrations. She participated actually in five demonstrations. And also her family, at least some of her family members, her brother-in-law, Nelson, and his wife were also involved in the organization, also received similar threats, and fled Colombia together with her. Now, what about her brother? Didn't her brother get asylum? Yes, he did. And he was involved in the organization, and that was the same? That he was involved and that he fled together with her. They fled together. And what we have to understand, I think, about these guerrilla groups is that they don't like to have opposition, and they go after anybody who's opposing them. In the record, it shows that the ELN is a very violent group. And there are actually cases that have found that a mere threat is enough to constitute past persecution. And death threats in and of themselves are used to persuade people to abandon their position. They are used as an instrument of terror. And as the expert witness stated, those death threats do escalate. Now, so that is the position by the worst past persecution. However, under the case law, mere threats in and of themselves have also been used to establish a reasonable fear of future persecution. And all the Petitioner has to show for a reasonable fear of future persecution to obtain asylum on that front is a 10 percent chance that she will be persecuted. And in the Lim case, while the Court did not find that there was past persecution, they did find that there was future persecution, or a reasonable fear, I should say, of future persecution. And the Lim case is actually close to our case in that there had been threats, in that there had been colleagues killed. But it's a lot easier for me in the Lim case to understand why that person would be identified as a target, why that person, they would actually try to go after him in the future. I find that more difficult to understand with regard to your client. The relocation issue, I think, is different. In his case, he was facing an organization that had motivation to pursue him wherever he went. I don't know that that's been established so clearly in the case of your client. Why couldn't she relocate? Well, Your Honor, actually, there is evidence in the case that three of her colleagues had relocated from Cali, where she also lived, to Bogota, and they were still threatened in Bogota. Well, you can threaten any place with a long-distance phone call, but that doesn't mean someone's got the capacity or the motivation to actually carry out the threats. And again, you talk about his colleagues, but we don't know that the colleagues were in a comparable position. Why is it this person is in jeopardy? Leaders, you understand. Rank-and-file members of an organization, not quite so apparent. Well, but she was singled out, whether she had a leadership role or not. So I think that if she is sent back, there is no safe place for her to relocate. The record also shows that she has the ELN is all over Colombia. The expert witness stated that, and it's reflected in the State Department reports. What was Maria, I guess, Zuluanga Valencia? Now, she was one that was threatened and then moved, and then she was killed, right? Ms. Valencia, let me double-check. Where was she? She was actually threatened. The one that was abducted, that basically disappeared, was Claudia Liliana Pazos. But Ms. Valencia was threatened. Was she killed or not? Claudia. Which one was killed? Claudia Liliana Pazos. Ms. Valencia was the one that was in the home.   So the one that was kidnapped was Claudia Liliana Pazos. That's on the administrative record at 510. And I see my time is up. Okay. You've used your time. Thank you. Good morning. Please support Jamie Dowd on behalf of the government. I think it's important to point out here, as the court stated previously, that while other inferences may be drawn from the evidence, there's nothing in the record that compels a conclusion contrary to what the immigration judge and the board reached in this case, namely that the telephonic threats alone did not rise to the level of past persecution and that there was no showing of a well-founded fear of future persecution. Well, I'm concerned about when saying that pointing a gun at someone isn't a close encounter. I mean, in terms of anything else in life, just because someone points a gun at you and misses or doesn't discharge the weapon, it really doesn't make it any less of a close encounter or a crime, for that matter. And particularly when you couple it with the fact that her house, it had never occurred in 15 years, it wasn't something when she wasn't home, but no one knows it, it's shot at her house. Why isn't that more? Well, the record reflects that the encounter where someone got out of the car and pointed a gun, nothing was said in that encounter in terms of to directly relate whoever that person was to the petitioner. In other words, there's no indication who that person was, what the motivation was for them pointing the gun. Well, but temporal to having threats and no other explanation of it. I mean, you don't view it in a vacuum. That's true, but I guess I would just repeat that there's nothing in the evidence that would compel the conclusion that that person was a member of the ELN, targeted the petitioner for her work in this group to which she belonged, or was targeting her singularly. There's a passage in a James Bond novel where Goldfinger is quoted as saying, once is happenstance, twice is coincidence, three times is enemy action. She's got death threats, she's got a bullet, and she's got a gun pointed at her. Is it really a difficult inference to think that the three of them have something to do with each other? Well, Your Honor, I guess what I would say to that is to point the court to the case law which was being discussed previously in terms of what, coupled with threats, rises to the level of past persecution. And just speaking of the Ruano case, there we're talking about a case in which the petitioner had received threats over years. I believe it was five or six years' period of time here. It was just several months. Also, the petitioner there had been chased on many occasions by armed men. So it's clear that, you know, while I take Your Honor's point, when you look at the case law of this court in terms of what, coupled with threats, rises to the level of past persecution, this case doesn't really seem to fall within those parameters. What does the record show with respect to her family members still in Colombia who had belonged to this same organization? I am not aware that her family members. She testified that her husband was not a member of this organization. He is still in Colombia. He lives in Bogota. I am not aware that she still has ten siblings living in Colombia. I'm not aware that they were members. Or if they were, the record doesn't reflect to what extent they were members. But she does have significant family still living in Colombia that the record reflects have lived there unharmed. Is it significant that her brother was granted asylum and is also a member and under similar factual predicates? Well, the record does reflect that he was granted asylum, but it does not reflect what his claim was in terms of what his membership was, if he was a member of this organization, what level his membership was, if any incidents other than or different than the ones to which she testified happened to him. So it would be hard to extrapolate simply from the fact that he was granted asylum that she should also be granted asylum. Well, I would agree. I mean, facts can be different in each one of them, but I'm not sure that it has no significance. It is part of the record, right? Just the fact that he was granted asylum is part of the record, yes. Well, if we disagreed with you and found that the petitioner had established past persecution, what's your position on whether a remand is appropriate on the issue of well-founded fear of future persecution? Well, the board did find no well-founded fear based on, well, all of the factors relating to the past persecution. But she wasn't given the presumption of past persecution. Correct. She was not given the presumption. However, the board did find that internal relocation was possible, which is relevant to the presumption of well-founded fear of future persecution because the presumption can be rebutted if internal relocation is possible. Did you address in the record the reasonableness of internal relocation? Not in terms of, well, the board simply found no past persecution and no well-founded fear because of the possibility of internal relocation. And there was testimony elicited during the hearing. Ms. Franco was asked whether there are areas in Columbia where the ELN does not operate. And at the record at 144, she answered that there were. You agreed to this. There is a section in your brief on this, isn't there? Yes. Yes, Your Honor. So when we also stated with regard to this issue, like I said, she agreed that there are areas in Columbia where the ELN do not operate. She has siblings still living in Columbia unharmed. She could return to Columbia and rejoin her husband. They have a business there that still operates. And her expert actually testified that the number of ELN combatants is less than the total number of combatants listed in the State Department report. So there are plenty of indications in the record that it would be reasonable to expect that she could relocate internally and not face the possibility of persecution. I'd like to just quickly address the fact that while in her brief, the petitioner has made a request for humanitarian asylum, that request was never made before the immigration judge or the board. So it has not been exhausted, and this Court should not consider it in the first instance. Are there no further questions? Thank you. Are there questions of the petitioner? Thank you. The case discarded is submitted for decision. We'll hear the next case, which is Bloomfield v. Astrea.
judges: Schroeder, Clifton, Callahan